KAREN NYHLEN
10540 Lakeside Dr N Unit C
Garden Grove, CA 92840-5059
Phone Number (310) 601-0446
Email: karen.nyhlen@gmail.com

IN PRO PER

FILED
CLERK, U.S. DISTRICT COURT

APR 1 0 2026

CENTRAL DISTRICT OF CALIFORNIA
BY ___ DEPUTY

PAID

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION (SANTA ANA)

| | |
|---|---|
| Karen Nyhlen, an individual;<br><br>          Plaintiff,<br><br>     vs.<br><br>Boundless Digital LLC, a California limited liability company;<br><br>Blue Ribbon Take LLC, a California limited liability company;<br><br>Frank Huerta, an individual; and<br><br>DOES 1 – 20, inclusive,<br><br>          Defendant(s). | Case No.: 8:26-cv-00873-JVS-(JDEx)<br><br>**COMPLAINT FOR:**<br>**1. COPYRIGHT INFRINGEMENT (17 U.S.C. § 101 et seq.)**<br>**2. FALSE DESIGNATION OF ORIGIN/ FALSE ENDORSEMENT (15 U.S.C. § 1125(a))**<br>**3. BREACH OF EXPRESS CONTRACT**<br>**4. FRAUD (PROMISSORY FRAUD)**<br>**5. BREACH OF IMPLIED-IN-FACT CONTRACT (DESNY)**<br>**6. MISAPPROPRIATION OF TRADE SECRETS (Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq.)**<br>**7. MISAPPROPRIATION OF TRADE SECRETS (CUTSA) (Cal. Civ. Code §3426)**<br>**8. UNFAIR COMPETITION (Cal. Bus. & Prof. Code § 17200)**<br>**9. DECLARATORY RELIEF (28 U.S.C. § 2201)**<br><br>**DEMAND FOR BENCH TRIAL** |

### INTRODUCTION

1. This action arises from Defendants' unauthorized exploitation of Plaintiff's original dramatic episodic direct response television series ("TV Series") and related intellectual property, including copyrighted works, trade secrets and commercially used identifying marks.

2. Plaintiff is the creator and owner of the TV Series (in which branded products are

integrated into scripted storylines and dialogue as embodied in registered scripts, audiovisual materials) and proprietary commercialization strategies.

3.     Defendants obtained access to Plaintiff's TV Series and other creative, business or proprietary materials through a written collaboration agreement, attached as Exhibit A (the "Agreement") between Plaintiff Karen Nyhlen, on the one hand, and Defendants Frank Huerta, Boundless Digital LLC and Blue Ribbon Take LLC, on the other hand, which granted limited authorization to use such materials solely for approved development and commercialization purposes of the TV Series.

4.     Defendants induced Plaintiff to enter into the Agreement by representing that Defendants would perform under its terms, including adhering to the agreed structure under which Defendants would not act as creative contributors to the TV Series. Plaintiff relied on these representations in executing the Agreement and providing Defendants with access to Plaintiff's proprietary materials. Defendants' subsequent conduct was inconsistent with those representations.

5.     Instead of performing their contractual obligations, Defendants exceeded the scope of any authorization granted by Plaintiff.

6.     Defendants used Plaintiff's identity and the title associated with the TV Series in a manner likely to cause confusion regarding Plaintiff's affiliation with or endorsement of Defendants' activities.

7.     Defendants disclosed Plaintiff's copyrighted materials to third parties in connection with casting and development activities without required confidentiality protections.

8.     Defendants developed and promoted, with the intention of exploiting, derivative audiovisual content incorporating protected expressive elements of Plaintiff's works.

9.     Defendants willfully breached the collaboration Agreement with Plaintiff.

10.     In addition, Defendants retained and have used or threatened to use Plaintiff's confidential list of targeted advertisers and related commercialization materials following the breakdown of the parties' relationship.

11.     Defendants' conduct has caused and continues to cause irreparable harm to Plaintiff's rights, reputation and commercial opportunities.

- 2 -
COMPLAINT FOR BENCH TRIAL

12.     Plaintiff seeks injunctive relief, damages, and declaratory relief to prevent further unlawful exploitation of Plaintiff's intellectual property and confidential business information and property.

**PARTIES**

13.     Plaintiff Karen Nyhlen ("Plaintiff") is an individual who conducts business and resides in Garden Grove, California and is the creator and owner of the TV Series at issue in this action.

14.     Defendant Boundless Digital LLC ("LLC 1") is a California limited liability company with its principal place of business in Los Angeles, California.

15.     Defendant Blue Ribbon Take LLC ("LLC 2") is a California limited liability company with its principal place of business in Los Angeles, California.

16.     Defendant Frank Huerta ("Individual Defendant") is an individual who conducts business in Los Angeles, California, primarily resides in West New York, New Jersey and sometimes in Los Angeles, and is the sole member and sole manager of both Defendant LLC 1 and Defendant LLC 2.

17.     The true names and capacities of Does 1 through 20 are unknown, and Plaintiff will amend this Complaint when ascertained.

**JURISDICTION AND VENUE**

18.     This action arises under the Copyright Act, 17 U.S.C. § 101 et seq., the Lanham Act, 15 U.S.C. § 1125(a) and the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836. This Court therefore has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338.

19.     This Court has supplemental jurisdiction over Plaintiff's related state law claims pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy as Plaintiff's federal claims.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because a substantial part of the events giving rise to the claims occurred in this District, including Plaintiff's development of the TV Series, the parties' negotiations of the Agreement, and Defendants' access to Plaintiff's materials in this District, and Defendants transact business within this District.

- 3 -
COMPLAINT FOR BENCH TRIAL

21.     Venue is also proper pursuant to the parties' written Agreement, which provides that the parties consent to the exclusive jurisdiction and venue of the state and federal courts located in Orange County, California.

22.     Defendants purposefully directed their activities toward this District, including by entering into contractual relationships with Plaintiff, accessing Plaintiff's intellectual property within this District, and engaging in promotional and commercial activities affecting Plaintiff within this District.

23.     Defendants' acts of copyright infringement, false designation of origin, false endorsement, breach of contract, fraud and misappropriation of trade secrets have caused harm to Plaintiff in this District.

## FACTS COMMON TO ALL CLAIMS

**A.     Creation and Development of the TV Series.**

24.     Six years prior to Defendants' involvement with the TV Series, Plaintiff conceived, created, and developed an original dramatic episodic television series entitled "*Living the Dream*™" (also known as "*Living the Dream TV*" and "*Living the Dream TV Show*") in which branded products and expert services are integrated into each episode's scripted storylines and dialogue. (the "TV Series"). Ten (10) episodes are planned for Season 1 of the TV Series (each, an "Episode" or collectively, "Episodes").

25.     From 2020 through 2026, Plaintiff created and authored multiple original works embodying the TV Series, including but not limited to teleplays, episodic outlines, audiovisual materials, artwork, logos and related branding assets.

26.     Plaintiff is the author and copyright claimant of these works and registered them with the United States Copyright Office ("USCO"), including the works identified in Exhibits B1 – B9:

| # | Date | Series Title | Title | Type | Work | Author | Copyright Claimant | Registration Number |
|---|------|-------------|-------|------|------|--------|-------------------|--------------------|
| 1 | 7/30/2021 | Living the Dream | Pilot Episode– The | Performing Arts | 30-minutes duration teleplay | Karen Nyhlen | Karen Nyhlen | PAu 4-097-672 |

COMPLAINT FOR BENCH TRIAL

| | | | Breakup and Meetup | | | | | |
|---|---|---|---|---|---|---|---|---|
| 2 | 10/8/2021 | Living the Dream TV Show | Key Art 1 - 4 | Visual Arts | four (4) versions of the Key Art | Karen Nyhlen | Karen Nyhlen | VAu 1-450-740 |
| 3 | 9/18/2022 | Living the Dream | Pilot Episode - The Breakup and Meetup – Final Scene | Motion Picture | Pilot Episode Final Scene | Karen Nyhlen | Karen Nyhlen | PAu 4-153-501 |
| 4 | 3/22/2023 | Living the Dream TV Show | Logos 1 - 3 | Visual Arts | three (3) versions of the Logo | Karen Nyhlen | Karen Nyhlen | VAu 1-499-575 |
| 5 | 4/3/2023 | Living the Dream TV Show | Socal Cartoon Map | Visual Arts | website art | Karen Nyhlen | Karen Nyhlen | VAu 1-504-776 |
| 6 | 8/5/2023 | Living the Dream TV Show – Season 1 | Ep. 102 Ep. 103 Ep. 104 Ep. 105 Ep. 106 Ep. 107 Ep. 108 Ep. 109 | Performing Arts | Scene Outlines of Season's 1 Episodes except the Pilot | Karen Nyhlen | Karen Nyhlen | PAu 4-189-386 |

COMPLAINT FOR BENCH TRIAL

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Ep. 110 | | | | | |
| 7 | 5/24/2024 | Living the Dream TV Show | California Cartoon Map | Visual Arts | website art | Karen Nyhlen | Karen Nyhlen | VAu 1-533-635 |
| 8 | 5/27/2024 | Living the Dream TV Show | California Cartoon Map | Visual Arts | two (2) icons from website art – Surfers in Wetsuits Golden Gate Bridge 2 | Karen Nyhlen | Karen Nyhlen | VAu 1-539-243 |
| 9 | 1/16/2026 | Living the Dream Season 1 | Pilot – (Ep. 101) Ep. 102 Ep. 103 Ep. 104 Ep. 105 Ep. 106 Ep. 107 Ep. 108 Ep. 109 Ep. 110 | Performing Arts | 7-minutes duration teleplays for each Episode in the microdrama format | Karen Nyhlen | Karen Nyhlen | *pending* Service Request No. 1-15078888431 |

27.     During this same time period (2020 – 2026), Plaintiff developed proprietary business materials and commercialization strategies for the TV Series, including a curated and verified list of potential sponsor advertisers (the "Targeted Advertisers List").

28.     Plaintiff also entered into agreements necessary to commercialize the TV Series, including:

COMPLAINT FOR BENCH TRIAL

a. On August 27, 2022, Plaintiff entered into a cast attachment agreement with the lead actress (the "Lead").

b. On November 21, 2022, Plaintiff entered into an agreement ("Media Buying Agreement") with a ("Media Buyer") enabling the purchase of paid programming airtime and targeted promo spots packages brokered by Media Buyer.

c. On November 15, 2025, Plaintiff entered into a distribution agreement for the exhibition of the TV Series in the domestic and foreign marketplaces on certain pay and broadcast television channels and streaming services platforms ("TV Series Distribution Agreement").

29. Using media buyer rate cards, Plaintiff developed a proprietary sponsor advertising model (the "Sponsor Advertiser Pricing Strategy"), under which advertisers purchase integrated placement of their brand, product or service into the storylines and dialogue within Episodes and receive downstream licensing rights ("Sponsor Integration Model").

30. Plaintiff reduced this Sponsor Integration Model to standardized contract forms, reviewed by counsel, which secured Plaintiff's ownership of all intellectual property while granting limited rights to advertisers.

31. On or around March 23, 2023, Plaintiff began marketing the TV and Sponsor Integration Model on the TV Series' website at https://www.livingthedreamtvshow.com/ ("TV Series Website").

32. Once the TV Series Website was launched, Plaintiff conducted targeted outreach campaigns to potential sponsor advertisers and contemporaneously expended time and resources developing the Targeted Advertisers List which includes verified key executives' and their contact information as well as other information Plaintiff targeted to track about the potential sponsor advertisers.

**B.    Agreement Negotiations between Plaintiff and Defendants.**

33. Because Plaintiff entered into a collaboration Agreement with, collectively, the Individual Defendant, LLC 1 and LLC 2, collectively, the Individual Defendant, LLC 1 and LLC 2 shall be referred to as the "Defendant" in the "Facts Common to All Claims" Sections B. through

M. in this Complaint. Further, Defendant LLC1 conducts business under the name "Boundless Digital Agency" which appears on Defendant LLC1's website and promotional materials. Therefore, the Agreement identifies LLC1 as "Boundless Digital LLC d/b/a Boundless Digital Agency" which was not a legally recognized Fictitious Business Name at the time the parties entered into the Agreement. Note these scrivener's errors:

        a.     The written, signed Agreement is version 9 despite the "v8" in the document header.

        b.     The title of the TV Series in Subsection 3 of the Agreement is another scriveners error. "LTD™ (a/k/a LTD TV and LTD TV Show; referred to herein as "LTD")" should read as "*Living the Dream*™" a/k/a "*Living the Dream TV*" and "*Living the Dream TV Show*."

34.    In November 2025, Plaintiff approached Defendant, a product placement and brand integration advertising agency and a production company, regarding a potential collaboration involving product placement and brand integration.

35.    On November 20, 2025, Defendant responded in writing, acknowledging the TV Series' uniqueness and commercial potential.

36.    On November 24, 2025, as per Exhibit C, Plaintiff's provided Defendant with:

        a.     copyrighted 30-minute Pilot Teleplay (under USCO Reg. No. PAu 4-097-672 on July 30, 2021; and under USCO Reg. No. PAu 4-153-501 on September 18, 2022) ("Pilot Teleplay"); and

        b.     copyrighted Scene Outlines for Season 1's Episodes 102 – 104 (under USCO Reg. No. PAu 4-189-386 on August 5, 2023) (the "Scene Outlines").

37.    On November 25, 2025, Plaintiff and Defendant met online and discussed reformatting the Episodes of the TV Series into a short-form "microdrama" format (from 30-minutes in duration to 5-7 minutes in duration) in addition to strategies for the parties to produce and exploit the TV series and Episodes in the microdrama format.

38.    At Defendant's request, Plaintiff agreed to prepare a microdrama-format version of the Pilot Teleplay and delivered it on December 1, 2025.

COMPLAINT FOR BENCH TRIAL

39.    Defendant approved the microdrama-format Pilot Teleplay on December 14, 2025.

40.    Plaintiff and Defendant negotiated the Agreement through January 17, 2026 when it was signed.

41.    During negotiations, Defendant insisted on inclusion of the Operator Carve-Out as a condition of entering the Agreement.  Under that provision, Defendant would not act as a creative contributor to the story, story arcs, characters or other elements of the TV Series or its Episodes. Plaintiff relied on Defendant's representation in executing the Agreement.

**C.    Key Terms of the Agreement between Plaintiff and Defendant.**

42.    The Agreement confirms that:

a.    The TV Series ("*Living the Dream*") will be the first episodic tv series to be produced in the microdrama format under the Agreement;

b.    Plaintiff is the sole author and owner, including copyright owner, of the TV Series, its Episodes and all related intellectual property;

c.    At Defendant's insistence pursuant to the Operator Carve Out, Defendant is not an author or creative contributor to the underlying works of the TV Series;

d.    Defendant's results and proceeds on the TV Series constitute "work made for hire" for Plaintiff; and

e.    Defendant is granted only limited rights necessary to perform under the Agreement.

43.    Plaintiff retained final creative control over all story, character, and narrative elements of the TV Series and its Episodes.

44.    Plaintiff retained final decision making authority over the terms and conditions of contracts for the exhibition of the TV Series and its Episodes; and Defendant had meaningful consultation rights.

45.    Defendant's role was primarily commercial and operational: to secure advertisers; and manage production to deliver the TV Series and its Episodes in the microdrama format to distributors, exhibitors and streaming platforms.

46.    Defendant agreed to:

COMPLAINT FOR BENCH TRIAL

a.      hire Plaintiff's attached lead actress ("Lead");

b.      obtain required rights from third parties using Plaintiff's pre-approved contract forms; and

c.      route all third-party agreements affecting intellectual property to Plaintiff for review and approval.

47.    The Agreement required Defendant to maintain the confidentiality of Plaintiff's proprietary information, including scripts, concepts, commercialization and pricing strategies, sponsor integration models, and advertiser data, both during the term of the the Agreement and after its termination.

### D.     Plaintiff's Performance.

48.    Plaintiff fully performed under the Agreement, including:

a.      delivering scripts, materials, and marketing assets;

b.      providing access to the Targeted Advertisers List; and

c.      preparing contract forms and casting materials.

49.    On January 17, 2026, Plaintiff and Defendant discussed the Targeted Advertisers List and Plaintiff provided Defendant with access to the Targeted Advertisers List and related materials pursuant to the Agreement, Subsection 26, for the limited purpose of the collaboration Agreement.  See, Exhibit D.

50.    On January 19, 2026, pursuant to the Agreement, Subsection 19.a., Plaintiff delivered the microdrama format teleplays for the ten (10) Episodes of the TV Series to Defendant. See, Exhibit E.

51.    On January 22, 2026, pursuant to the Agreement, Plaintiff and Defendant entered into a supplemental agreement whereby Plaintiff authorized Defendant to sign NDAs on behalf of the TV Series pursuant to specific protocol.  See, Exhibit F.

52.    On January 25, 2026, Plaintiff provided Defendant with Plaintiff's additional marketing materials: pitch decks and copyrighted artwork.

53.    On January 28, 2026, Defendant advised Plaintiff that work was progressing on Defendant's websites at:  https://boundlessdigitalagency.com/;

- 10 -
COMPLAINT FOR BENCH TRIAL

https://boundlessdigitalagency.com/living-the-dream-tv-show/;

https://boundlessdigitalagency.com/brand-placement/; and https://boundlessdigitalagency.com/for-brands/.

54.    Defendant used Plaintiff's Key Art (USCO Reg. No. VAu 1-450-740 on October 8, 2021) on its websites (the "Key Art").

55.    On January 29, 2026, Plaintiff asked Defendant to revise Plaintiff's biography on the Defendant's website because Plaintiff was not a member of the Directors Guild of America ("DGA") as announced on Defendant's website at, https://boundlessdigitalagency.com/living-the-dream-tv-show/.



56.    In January, 2026, Plaintiff provided Defendant with:

 a.    an introduction to the Distributor for the TV Series (per Subsection 27. of the Agreement) for the purpose of the Defendant's sales campaign to secure advertisers;

 b.    Sponsor Advertising Pricing Strategy; and

 c.    Sponsor Integration Model.

57.    Defendant replicated the Sponsor Advertising Pricing Strategy and Sponsor Integration Model and promoted the Sponsor Integration Model on Defendant's websites.

58.    Plaintiff provided Defendant with contract forms for the TV Series (per Subsection 11.):

 a.    Draft Standard Terms and Conditions for Advertisers based on the Plaintiff's

attorney approved contract forms.

        b.     Draft Actor Agreement.

**E.**     **Dissemination to Talent Manager.**

59.     On January 30, 2026, Defendant informed Plaintiff that Defendant's Manager, Tim Taylor, at Luber Roklin Entertainment, Inc., a Los Angeles talent management and production company ("Defendant's Manager"), was going to help the parties cast the TV Series and may be able to cast "a name" and possibly secure some brands.  See Exhibit G.

60.     On January 31, 2026, Defendant provided Plaintiff with an example Role Breakdown/Scene Audition that Defendant received from Defendant's Manager so that Plaintiff could prepare Role Breakdown/Scene Auditions for the cast of the TV Series.  See Exhibit H.

61.     Plaintiff drafted the Role Breakdowns/Scene Auditions using the microdrama format teleplays for the Episodes of the TV Series.  See, Exhibit I which is an email chain between the parties concerning the Role Breakdowns/Scene Auditions that Plaintiff drafted for the TV Series and its Episodes that embodied portions of microdrama format teleplays.

62.     On February 4, 2026, Defendant acknowledged receipt of the ten (10) Role Breakdowns/Scene Auditions from Plaintiff.  See Exhibit I.

63.     Defendant removed five (5) Role Breakdowns/Scene Auditions from the proprietary casting files: two male leads, a supporting female character, a personal trainer, and two (2) lifeguards combined as one role.  See Exhibit J:

        a.     Print screen showing the activity in the "cast folder" where "sales office" removed five (5) Role Breakdowns/Scene Auditions;

        b.     Print screen showing that the "sales office" email address used to be the Defendant's email address for the TV Series;

        c.     Print screen showing that the Plaintiff, who is the file owner, "has to request access" to Plaintiff's own file; and

        d.     One (1) Role Breakdown/Scene Audition listing Plaintiff as the Writer, Defendant as the Executive Producer and Defendant's Manager as Casting Director.  These Role Breakdowns/Scene Auditions were derived from Plaintiff's microdrama format

teleplays and contained character descriptions, relationships, and narrative functions for the TV Series.

64.    On February 8, 2026, Defendant shared a "Sales" folder with pricing strategies with Plaintiff which replicated Plaintiff's Sponsor Advertising Pricing Strategy and Sponsor Integration Model.  See, Exhibit K.

65.    On February 9, 2026, Defendant and Plaintiff discussed: a) Defendant's pricing strategy and sponsor integration model that replicated Plaintiff's Sponsor Advertising Pricing Strategy and Sponsor Integration Model sent the day before; and b) certain prospects on the Targeted Advertisers List.  See, Exhibit L.

**F.    Breach of Operator Carve-Out.**

66.    After obtaining access to Plaintiff's materials, Defendant began proposing changes to the storyline that differed from the approved teleplays.  On February 16–17, 2026, Defendant demanded Plaintiff agree to Defendant's so-called "adaptation" of the TV Series which in actuality materially altered the story:

a.    Defendant proposed that the Lead engage in a "steamy romance" and emotional breakdowns throughout the season, which differed from the storyline reflected in the approved teleplay.

b.    For the opening scene of the Pilot, instead of the Lead surfing and anticipating a marriage proposal from her boyfriend, Defendant described a wedding scenario in which the Lead is left at the altar.

c.    Defendant then described Defendant's vision of the artwork based on the above adaptation of the Pilot Teleplay.  The artwork featured the Lead (blonde California girl) crying in a wedding dress in between two handsome men in tuxes.  The Defendant said Defendant could make the artwork for Defendant's adaptation with AI (the "Defendant's Wedding AI Key Art").  Below is Plaintiff's depiction of Defendant's Wedding AI Key Art.

//

//

//

COMPLAINT FOR BENCH TRIAL

    d.      Defendant said Defendant would only market the TV Series to advertisers and produce the TV Series and its Episodes if Plaintiff agreed to Defendant's so-called "adaptation" that was really a material change to the storyline.

67.    Plaintiff rejected the Defendant's adaptation and reiterated Plaintiff's right to creative control and pointed out to Defendant that the beach and surfing were always a predominant feature of the TV Series, Defendant approved the microdrama format Pilot Teleplay before Plaintiff entered into the Agreement, and that there were to be no revisions to the microdrama format teleplays until an advertiser was under contract.

68.    Defendant called Plaintiff a "prima donna" in response to Plaintiff's exercising Plaintiff's contractual rights and called Plaintiff the next day, February 17, 2026, to further discuss Defendant's so-called adaptation of the TV Series and sent two emails while the parties were on the phone, attached as Exhibits M1 and M2.

69.    Defendant's adaptation emails and texts will be discussed in more detail in the Substantial Similarity Test, Section K. below.  In summary, both of Defendant's versions of the Pilot opening scene described a wedding scenario in which the Lead is left at the altar, the central narrative involved a romantic triangle during the Season 1's ten (10) Episodes, and liberally used the title of Plaintiff's TV Series – "*Living the Dream*" - throughout.

70.    On February 19, 2026, Defendant sent a text to Plaintiff with an explanation for Defendant's so-called "adaptation:" "the story was written for one medium now we're on a different

COMPLAINT FOR BENCH TRIAL

medium so the original pacing, exposition and storyline don't neatly fit in. It's very common and that's what I'm trying to show you. But you think it's uncommon." See, Exhibit N.

**G.    False Designation of Origin/False Endorsement.**

71.    On February 18, 2026, Defendant published "updated" versions of its websites, including: https://boundlessdigitalagency.com/ ; https://blueribbontake.com/ ; https://frankyhuerta.com/ which continued to state that Plaintiff was a member of the DGA, despite that this statement was false.

72.    On February 18, 2026, Plaintiff requested that Defendant correct its use of Plaintiff's identity and the title associated with the TV Series on https://boundlessdigitalagency.com/, explaining that the false DGA statement and related content created confusion regarding the Plaintiff's affiliation with and endorsement of Defendant's activities. See, Exhibit O1.

73.    On February 18, 2026, Plaintiff also requested that Defendant correct multiple inaccuracies on https://blueribbontake.com/, including misspellings of Plaintiff's name and errors concerning the characters and storyline of the TV Series. See, Exhibit O2.

74.    From January 29, 2026 through February 26, 2026, Plaintiff requested in writing no fewer than twenty (20) times that Defendant correct the false statement that Plaintiff was a member of the DGA.

75.    During a phone call in early February 2026, Defendant stated that the requested corrections were in a "suspense" file pending publication on the websites.

76.    Defendant did not correct the false DGA statement or the other inaccuracies on its websites.

77.    On February 26, 2026, during a phone call regarding termination of the Agreement, Plaintiff again raised the false DGA statement. Defendant initially denied that the statement appeared on the websites. After reviewing the content, Defendant acknowledged the statement and responded that it was "only one sentence."

78.    Defendant's use of Plaintiff's name, identity, and association with the TV Series on its websites was without Plaintiff's authorization.

//

**H.    Termination.**

79.    On or around February 26, 2026, due to Defendant's material and willful breaches of the Agreement, Plaintiff terminated the Agreement and asked Defendant to remove Plaintiff's name, likeness, artwork and TV Series from both of Defendant's websites before March 7, 2026.. See, Exhibit P.

80.    On February 27, 2026, Defendant replied that Defendant would have everything removed by end of day. See, Exhibit Q.

**I.    Post-Termination Conduct.**

81.    Following termination of the Agreement, Defendant continued to use Plaintiff's materials and retained access to Plaintiff's proprietary information, including:

    a.    Continued to use Plaintiff's name, copyrighted artwork and TV Series on Defendant's websites as of March 2, 2026 (See, Exhibit R).

    b.    Failed to remove Plaintiff's name, copyrighted artwork and TV Series from its websites as of March 9, 2026 (See, Exhibit S); and

    c.    Retained access to Plaintiff's proprietary information: including but not limited to the Targeted Advertisers List; Sponsor Advertiser Pricing Strategy; and Sponsor Integration Model.

82.    On March 2, 2026, Plaintiff asked Defendant to reimburse Plaintiff for the $1,500 Plaintiff paid Plaintiff's attorney to add Defendant's "Operator Carve Out Language" because Defendant did not honor the Agreement, particularly the Operator Carve-Out the Defendant insisted on including as a condition of entering the Agreement during negotiations, and under that provision, Defendant would not act as a creative contributor to the story, story arcs, characters or other elements of the TV Series or its Episodes.  Plaintiff relied on Defendant's representation in executing the Agreement and paid Plaintiff's attorney to review and approve its inclusion in the Agreement.

83.    On March 2, 2026, Defendant replied to Plaintiff's request for reimbursement: "Your obviously spiraling.  I was clearly hired as WFH.  Why would I invest in your operational overhead? I tried my best to bring it to life but we couldn't see to eye. You terminated me and that's

how we ended."

84.    On March 2, 2026, Defendant's email to Plaintiff: "This is now off all sites, you take a look at your convenience.  The new show is not called living the dream." See, Exhibit T.

85.    The Defendant's March 3, 2026 email to Plaintiff:  "We tried to work together but as you stated you can't work with me anymore.  When you fire someone you can't also have them pay you for your own infrastructure. I'm sorry that you're so upset, I wish we were able to switch projects and keep working but we can't. At this point I do t know why else to say.  But I'm definitely not paying your legal fees."

86.    On March 3, 2026, Plaintiff replied: "Switching projects was not part of our agreement."

87.    On March 3, 2026, Defendant replied: "It was once you agreed to it, now you're being childish. Are you going to pretend we didn't have hours of conversations discussing a plan to create many shows to put into distribution. We didn't speak about repositioning ourselves online, about me putting out vignettes, or about you writing them? Didn't I redo the websites to portray our new ideas? I'm not sure if you're trying to bait me into an argument, but it won't work. You terminated our agreement as it is your right to do so. I think it was a mistake but that's your prerogative. Please stop sending me these types of messages, I don't have time to play games."

## J.    Unauthorized Derivative Work.

88.    On March 8, 2026, which is the day after Plaintiff's due date for Defendant to remove Plaintiff's name, likeness, artwork and TV Series from Defendant's websites, Plaintiff discovered that Defendant's websites were promoting a microdrama tv series entitled "*Almost.*"

89.    Plaintiff recognized the key art immediately. The artwork for "*Almost*" is the Defendant's Wedding AI Key Art that Defendant described to Plaintiff in the February 16, 2026 phone call when Defendant was describing Defendant's "adaptation" of the TV Series – from surfing to a wedding scenario in which the lead character is left at the altar.  The AI image posted below was copied from LLC 2's website on March 31, 2026 and it was created with ChatGPT AI on March 2, 2026.

//

COMPLAINT FOR BENCH TRIAL



90.     While Plaintiff disagreed on February 16 and 17, 2026, that Defendant's "adaptations" of the TV Series were true adaptations as that term is commonly known, the Defendant believed that the Defendant's adaptations were adaptations and that is what the Defendant repeatedly told Plaintiff.  See Exhibits M1, M2 and N.

91.     Plaintiff did not authorize Defendant to create any derivative or modified version of the TV Series.

**K.      Substantial Similarity Test.**

92.     Defendant's "*Almost*" (See, Exhibit U) is substantially similar to Plaintiff's TV Series (https://www.livingthedreamtvshow.com/) in terms of serialized dramatic structure, narrative structure, characters and relationship dynamics, as follows.

93.     Substantial similarity of dramatic structure:  Both "*Almost*" and the TV Series are:

a.     "Verticals" (video is viewed in a vertical screen instead of traditional horizontal screen ratio for viewing on the phone).

b.     Microdramas set in Orange County, California.

c.     45-90 seconds in duration episodes.

d.     Serialized dramatic structure with episodic cliffhanger endings.

94.     Substantial similarity of narrative structure:

a.     "*Almost*" "is a romantic drama set inside Orange County's status-driven social world."  The tag line is "The wedding ended.  The choice didn't."

COMPLAINT FOR BENCH TRIAL

b.    TV Series: Series follows a California girl from a prominent Newport Beach family, her friends, and their extended families.  California girl meets a dashing stranger after a bad breakup with her long term boyfriend when she thought he was going to propose, and his family had planned for a dynasty with her family.  The California girl wants her boyfriend back and the dashing stranger is chasing her.  Who does she choose?

95.    Substantial similarity of characters and their relationship dynamics:

a.    Defendant's "*Almost*" has a crying blonde in a romantic triangle with two handsome, presumably wealthy men, after the "wedding ended" per the key art tag line "The wedding ended.  The choice didn't."

b.    In Defendant's "example eppisdoes email" "adapting" the TV Series, Episode 1 is a wedding that did not happen and Episode 9 is entitled "Choice." See, Exhibit M1.

c.    Plaintiff's TV Series has a California blonde in a romantic triangle with two wealthy, handsome men ("Male Leads") after the California blonde thinks she is going to receive a marriage proposal but instead, her long term boyfriend breaks it off.  Episode 7's title is "*Choices*."

d.    Two (2) of the Role Breakdowns/Scene Auditions that Defendant sent to Defendant's Manager on or around February 5, 2026 for casting purposes are Plaintiff's two (2) Male Leads.  See, Exhibit J.a.

L.    **Continued Use.**

96.    As of March 9, 2026, Plaintiff's name, TV Series, and copyrighted Key Art were still posted on Defendant's websites:

a.    Attached as Exhibit V is Defendant's URL with a "broken link" to a webpage using the title of Plaintiff's TV Series printed on March 9, 2026:

Boundlessdigitalagency.com/**LIVING-THE-DREAM-TV-SHOW**

b.    Attached as Exhibit S is Defendant's URL, Boundlessdigitalagency.com/how-it-works webpage printed on March 9, 2026: continued to post Plaintiff's name, TV Series, and copyrighted Key Art, indicating that Plaintiff and the

TV Series were available by contacting Defendant.

**M.     Cease and Desist.**

97.     On March 9, 2026, per Exhibit W, Plaintiff sent a cease and desist letter to Defendant:

a.     Defendant's microdrama "*Almost*" is an unauthorized derivative work of Plaintiff's TV Series;

b.     Plaintiff terminated the collaboration Agreement because Defendant continually breached the Agreement and refused to cure Defendant's breaches;

c.     Defendant is violating Plaintiff's rights and infringing Plaintiff's copyright by continuing to advertise Plaintiff's name, TV Series and copyrighted Key Art on Defendant's website.

98.     On March 9, 2026, Defendant responded to Plaintiff's email to Defendant about the broken link to the *Boundlessdigitalagency.com/LIVING-THE-DREAM-TV-SHOW*: "The link your providing goes to a broke link a 404 page saying this page does not exist. Your reaching , and per our conversation and the email you sent me you terminated our agreement. …Your reaching, a quite frankly given the accusatory tone tone of all of your emails and texts are encroaching on harassment.  As I told you before please stop contacting me with your harassing messages. It's not professional and it started of by you trying to extort me for your lawyer fees for the work for hire contract you had me sign." See, Exhibit X.

99.     On March 9, 2026, Defendant replied to Plaintiff's 3/9/2026 cease and desist letter by text. "Yea I know I just replied, im not scared of you, or your emails. I'm not in any breach and my show is not yours. You have nothing to do with my projects. Not one of your scenes are in my show in anyway shape or form. If you want to spend money suing me to lose to ahead."

100.     On March 9, 2026, Defendant replied to Plaintiff's 3/9/2026 cease and desist letter by text: "How it it an adaptation.  You don't even know the story lol.  Instead of being obsessed with what I'm doing you should work on your own projects and get them going.  But by all means if you think you right do what you have to do."

101.     On March 9, 2026, Plaintiff replied to Defendant's 3/9/2026 text that Plaintiff will

tell the judge that Defendant called "*Almost*" an adaptation on the phone and in writing.

102.    On March 9, 2026, Defendant replied to Plaintiff's 3/9/2026 text: "Where I don't see that in our messages. So your guna lie to the judge. That's your big plan? Really smart."

103.    On March 9, 2026, Defendant sent an email to Plaintiff that included : "Out of an abundance of caution, I have reviewed my websites to ensure that no legacy or inactive links related to Living the Dream remain." See, Exhibit Y.

104.    On March 13, 2026, Defendant still had a webpage using the title of Plaintiff's TV Series. Boundlessdigitalagency.com/**LIVING-THE-DREAM-TV-SHOW** which is the webpage Defendant refused to delete. See, Exhibit Z.

105.    On March 16, 2026, Plaintiff notified Defendant's Manager that Defendant's microdrama "*Almost*" is an unauthorized derivative work of Plaintiff's TV Series and that Defendant got Defendant's Manager involved when Defendant gave Plaintiff's copyrighted property to the Defendant's Manager.  Plaintiff said if the matter could not be resolved promptly, Plaintiff is prepared to pursue all available remedies.  See Exhibit AA.  Note that the entire March 16, 2026 email chain between the parties (including Defendant's Manager) is on Exhibit AA.

106.    On March 16, 2026, Defendant responded to Plaintiff's notice to Defendant's Manager: "Your allegations are incorrect. "Almost" is an original work created independently and does not derive from "Living the Dream" or any materials associated with it.  As you previously terminated our collaboration, I am proceeding with my own independent project. Any suggestion that I am exploiting your intellectual property is false. Please direct any further communications regarding this matter through legal counsel." See, Exhibit AA.

107.    On March 16, 2026, Plaintiff replied to Defendant that the notice was directed to Defendant's Manager and asked for Defendant's counsel information. See, Exhibit AA.

108.    On March 24, 2026, Plaintiff followed up with an offer to settle before a trial by judge.

    a.    In connection with the Targeted Advertisers List, Plaintiff requested: its return; that Defendant cease and desist contacting the Targeted Advertisers; an accounting of which Targeted Advertisers had been contacted and a signed NDA if applicable; the

COMPLAINT FOR BENCH TRIAL

disgorgement of any proceeds collected from a Targeted Advertiser; and an accounting of to whom the Targeted Advertisers List had been provided and a signed NDA from each of such individuals.

b.     In connection with the microdrama project "*Almost*," Plaintiff demanded that Defendant cease and desist working on this derivative work of Plaintiff's TV Series and take the "*Almost*" project off Defendant's websites in perpetuity.

c.     In connection with the Role Breakdowns/Scene Auditions that Defendant delivered to Defendant's Manager, Plaintiff requested a certified list of the individuals who have read them,  a signed NDA from them, and Defendant's certification under of perjury that Defendant has obtained a signed NDA from all third parties who have received Plaintiff's copyrighted works.

d.     Plaintiff demanded that Defendant delete and never use the Sponsor Advertising Pricing Strategy, Branding Materials, Artwork and all other commercialization materials Plaintiff delivered to Defendant in addition to Defendant's certification of such deletion under penalty of perjury.

e.     Plaintiff demanded that Defendant delete all contract forms Plaintiff provided for the benefit of the TV Series and certify to same under penalty of perjury.

f.     Defendant's offer for damages to compensate Plaintiff for Defendant's willful breach of the Agreement that both parties entered into with the express goal of being paid for their collaborative efforts.

109.   Plaintiff has not received a response from the Defendant since the March 16, 2026 email.

## COUNT I

### Copyright Infringement (Unauthorized Derivative Works and Scope-Exceeded Use)

### (17 U.S.C. § 101 et seq.)

110.   Plaintiff realleges and incorporates by reference each of the preceding paragraphs.

111.   Plaintiff is the author and owner of valid copyrights in original creative works embodying the dramatic episodic television series (the "TV Series"), including but not limited to

- 22 -
COMPLAINT FOR BENCH TRIAL

teleplays, episodic outlines, scripted scenes, audiovisual footage, narrative sequences, and related expressive elements (collectively, the "Copyrighted Works").

112. Plaintiff has obtained valid copyright registrations covering the Copyrighted Works, including, without limitation, the Pilot Teleplay and Episodic Scene Outlines for Season 1 and the Key Art.

113. The day before the Agreement was signed, the microdrama format teleplays for the TV Series were submitted for copyright registration on January 16, 2026, with the application filed, fees paid, and deposit copies submitted to the United States Copyright Office. Plaintiff will amend this Complaint to include such works upon issuance of the registration certificate.

114. Defendants obtained access to the Copyrighted Works through the parties' collaborative relationship and pursuant to a written agreement that granted Defendants limited authorization to use the Copyrighted Works solely for the purpose of developing and promoting the TV Series as approved by Plaintiff.

115. Defendants exceeded the scope of any authorization granted by Plaintiff and, without Plaintiff's consent, reproduced, prepared derivative works from, displayed, distributed, or otherwise exploited expressive content derived from the Copyrighted Works.

116. Defendants' acts include the development, promotion, and dissemination of audiovisual materials that are substantially similar to protectable expression contained in Plaintiff's registered Copyrighted Works. Defendants had access to the Copyrighted Works, and the accused works are substantially similar to protected expression contained therein.

117. The derivative content developed and promoted by Defendants incorporates protected expressive elements of Plaintiff's works, including but not limited to plot structure, character archetypes, relationship dynamics, and specific narrative sequencing unique to the Series, as embodied in Plaintiff's registered works.

118. Defendants' infringing works are derivative of Plaintiff's Copyrighted Works in that they recast, transform, and adapt protected expression from the TV Series into new audiovisual content.

119. Defendants' conduct infringes Plaintiff's exclusive rights under 17 U.S.C. § 106,

- 23 -
COMPLAINT FOR BENCH TRIAL

including the rights to reproduce the Copyrighted Works, prepare derivative works, distribute copies, and publicly display protected expression.

120. Defendants' infringement has been willful, as Defendants continued such conduct after receiving notice of Plaintiff's ownership rights, scope limitations, and objections, including after termination of the Agreement.

121. As a direct and proximate result of Defendants' infringement, Plaintiff has suffered and will continue to suffer irreparable harm, including loss of control over the Copyrighted Works, diminution of their commercial value, and interference with Plaintiff's ability to develop and exploit the Series.

122. Plaintiff is entitled to injunctive relief, statutory damages, actual damages, disgorgement of Defendants' profits, attorneys' fees where permitted, and all other remedies available under the Copyright Act.

## COUNT II

## FALSE DESIGNATION OF ORIGIN / FALSE ENDORSEMENT

## (15 U.S.C. § 1125(a))

123. Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.

124. Defendants used Plaintiff's name, identity, and association with the TV Series, as well as the title of the TV Series, in commerce on Defendants' websites and promotional materials in connection with Defendants' business activities.

125. Defendants made false and misleading statements of fact, including but not limited to representing that Plaintiff was a member of the Directors Guild of America ("DGA") and presenting Plaintiff and the TV Series in connection with Defendants' services and promotional content.

126. Defendants' use of Plaintiff's name, identity, and the TV Series, including the title of the TV Series as a designation of origin, together with the false DGA statement and related content, was likely to cause confusion, mistake, or deception as to Plaintiff's affiliation, connection, or association with Defendants, and as to Plaintiff's sponsorship or endorsement of Defendants' activities.

COMPLAINT FOR BENCH TRIAL

127.   Defendants continued such use after receiving repeated written notice from Plaintiff that the statements were false and misleading and created confusion, including continued use of the TV Series title in URLs and web content.

128.   Defendants' conduct was willful.

129.   As a direct and proximate result of Defendants' conduct, Plaintiff has been and will continue to be damaged, including through harm to Plaintiff's reputation, loss of control over Plaintiff's identity and brand, and interference with Plaintiff's business opportunities.

130.   Plaintiff is entitled to injunctive relief, damages, Defendants' profits, and such other relief as the Court deems just and proper pursuant to 15 U.S.C. § 1116 and § 1117.

**COUNT III**

**BREACH OF EXPRESS CONTRACT**

131.   Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.

132.   Plaintiff and Defendants entered into a valid, written Agreement on or about January 17, 2026.

133.   The Agreement sets forth, among other things, that:

a.     The TV Series entitled, "*Living the Dream,*" will be the first episodic television series to be produced in the microdrama format under the Agreement;

b.     Plaintiff is the sole author and owner of the TV Series, its Episodes, and all related intellectual property;

c.     Defendants are not an author or creative contributor to the underlying works of the TV Series pursuant to the Operator Carve-Out;

d.     Defendants' contributions to the TV Series constitute work made for hire for Plaintiff;

e.     Plaintiff retains final creative control over the story, characters, and narrative elements of the TV Series and its Episodes;

f.     Plaintiff retains final decision-making authority over the terms and conditions of contracts for the exhibition of the TV Series and its Episodes;

- 25 -

COMPLAINT FOR BENCH TRIAL

g.      Defendants' role was primarily commercial and operational: to secure advertisers; and manage production to deliver the TV Series and its Episodes in the microdrama format to distributors, exhibitors and streaming platforms;

h.      Defendants were required to maintain the confidentiality of Plaintiff's proprietary information, including scripts, concepts, commercialization and pricing strategies, sponsor integration models, and advertiser data, both during the term of the the Agreement and after its termination; and

i.      Defendants' performance under the Agreement was subject to Plaintiff's approval and final authority over creative and distribution decisions.

134.    Plaintiff fully performed all obligations required under the Agreement, including delivering scripts, materials, marketing assets, contract forms, and providing Defendants with access to Plaintiff's proprietary materials.

135.    Defendants materially breached the Agreement, including by:

a.      asserting creative control over the TV Series and proposing substantive changes to the storyline, in violation of the Operator Carve-Out and Plaintiff's retained creative authority;

b.      refusing to perform its obligations under the Agreement unless Plaintiff agreed to Defendants' proposed changes to the story;

c.      failing to perform its commercial and operational obligations, including securing advertiser sponsors;

d.      using Plaintiff's proprietary materials, including the Targeted Advertisers List, Sponsor Advertiser Pricing Strategy, and Sponsor Integration Model, outside the scope permitted by the Agreement;

e.      failing to maintain the confidentiality of Plaintiff's proprietary information;

f.      continuing to use Plaintiff's name, likeness, the title of the TV Series, copyrighted works and Plaintiff's materials after termination of the Agreement; and

g.      anticipatorily breaching the Agreement by refusing to perform unless Plaintiff relinquished Plaintiff's contractual rights, including creative control.

COMPLAINT FOR BENCH TRIAL

136.    Defendants' breaches were material and go to the core of the Agreement.

137.    As a direct and proximate result of Defendants' breaches, Plaintiff has been damaged, including but not limited to loss of business opportunities, loss of advertiser relationships, delay or disruption of production and distribution, loss of control over Plaintiff's intellectual property and business strategies, and out-of-pocket costs. Plaintiff has also suffered and will continue to suffer irreparable harm for which there is no adequate remedy at law.

138.    Pursuant to the terms of the Agreement and applicable law, Plaintiff is entitled to damages, as well as injunctive and equitable relief.

## COUNT IV

## FRAUD (PROMISSORY FRAUD)

139.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.

140.    During negotiations leading to the execution of the Agreement, Defendants expressed concern that the phrase "work made for hire" could imply that Defendants were employees of Plaintiff, while acknowledging that Plaintiff owned all intellectual property rights, including copyrights, in and to the TV Series and its Episodes.

On January 16, 2026, Defendants proposed inclusion of an Operator Carve-Out that Defendants drafted, stating that the carve-out "does not affect [Plaintiff's] exclusive ownership of the [TV Series] [intellectual property]." Defendants further represented, both orally and in writing, that they would enter into and perform under the Agreement only if such language was included, and that Defendants would not act as creative contributors to the story, story arcs, characters, or other expressive elements of the TV Series, as reflected in the Operator Carve-Out.

Plaintiff relied on these representations by agreeing to include the Operator Carve-Out and by incurring legal fees to have counsel review and approve its inclusion in the Agreement. Defendants made these representations to induce Plaintiff to enter into the Agreement and disclose proprietary materials.

141.    Defendants made these representations as a material condition to induce Plaintiff to enter into the Agreement.

142. At the time Defendants made these representations, Defendants did not intend to perform as promised and instead intended to obtain access to Plaintiff's proprietary materials while disregarding the agreed limitations on creative control.

143. Plaintiff reasonably and justifiably relied on Defendants' representations in executing the Agreement, including by:

    a. agreeing to include the Operator Carve-Out language;

    b. incurring legal fees to review and approve the Agreement; and

    c. providing Defendants with access to Plaintiff's proprietary materials, including the Targeted Advertiser List, Sponsor Advertiser Pricing Strategy, Sponsor Integration Model, scripts, and related materials.

144. Within approximately one month of execution of the Agreement, and after obtaining access to Plaintiff's materials, Defendants acted contrary to their representations by:

    a. proposing and insisting upon substantive changes to the storyline;

    b. asserting creative control over the TV Series; and

    c. refusing to perform its obligations under the Agreement unless Plaintiff agreed to Defendants' proposed changes.

145. Defendants' conduct was directly contrary to the agreed Operator Carve-Out and demonstrates that Defendants did not intend to perform as represented at the time the Agreement was executed.

146. Plaintiff was damaged as a result of Defendants' conduct, including but not limited to disclosure of proprietary materials, loss of control over Plaintiff's intellectual property and business strategies, loss of business opportunities, and out-of-pocket costs.

147. Defendants' conduct was fraudulent, willful, and malicious, and carried out with conscious disregard for Plaintiff's rights, entitling Plaintiff to punitive damages.

//

//

//

//

- 28 -

COMPLAINT FOR BENCH TRIAL

# COUNT V

## Breach of Implied-in-Fact Contract (Desny Claim)

## Desny v. Wilder, 46 Cal. 2d 715, 299 P.2d 257 (Cal. 1956).

## (California Law – Pled in the Alternative)

148. Plaintiff realleges and incorporates by reference each of the preceding paragraphs.

149. This claim is pled in the alternative to Plaintiff's claim for breach of express contract.

150. Plaintiff developed an original dramatic episodic direct response television series concept and related creative materials, including scripts, episodic outlines, narrative structures, and commercialization strategies.

151. Plaintiff disclosed these materials to Defendants under circumstances demonstrating that Plaintiff expected to be compensated for any use of the disclosed ideas and creative content, and that Defendants knew or should have known of such expectation.

152. The parties' interactions occurred within the entertainment industry, where it is customary for creators who disclose original concepts and materials in furtherance of potential production and commercialization to expect compensation if such materials are used.

153. Defendants accepted Plaintiff's disclosures and engaged in discussions and collaborative activities relating to the development, casting, sponsorship, and commercialization of the TV Series and its Episodes.

154. Defendants subsequently used or exploited the disclosed ideas and materials, or derivatives thereof, without providing compensation to Plaintiff.

155. To the extent that the Court finds that Defendants' conduct falls outside the scope of the parties' written Agreement, Defendants' use of Plaintiff's disclosed ideas and materials constitutes a breach of an implied-in-fact contract. This claim is based on Defendants' breach of an implied promise to pay for the use of Plaintiff's disclosed ideas, and not on rights equivalent to those protected under copyright law.

156. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered damages including lost compensation, lost commercialization opportunities, diminution in the value

COMPLAINT FOR BENCH TRIAL

of Plaintiff's creative works and business model, and unjust enrichment to Defendants.

157.    Plaintiff is entitled to recover damages and all other relief available under California law.

## COUNT VI

### Misappropriation of Trade Secrets

### (Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq.)

158.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs.

159.    Plaintiff developed and owned proprietary confidential business information relating to the financing, commercialization, and distribution strategy for the television series at issue ("TV Series"), including a curated list of potential sponsor advertisers, contact histories, targeting methodologies, and related commercialization materials (collectively, the "Trade Secrets").

160.    The Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable by, other persons who could obtain economic value from their disclosure or use.

161.    Plaintiff took reasonable measures to maintain the secrecy of the Trade Secrets, including limiting access to Defendants pursuant to written contractual confidentiality obligations, restricting dissemination of such information to authorized purposes, and maintaining the information in controlled-access environments.

162.    Defendants acquired knowledge of the Trade Secrets through their contractual relationship with Plaintiff and through Plaintiff's limited disclosures made solely for the purpose of developing and commercializing the TV Series.

163.    Following the termination or breakdown of the parties' relationship, Defendants retained access to and possession of the Trade Secrets without authorization and failed to return or destroy such information despite Plaintiff's demands.

164.    Defendants have used, and continue to use or threaten to use, the Trade Secrets in connection with efforts to develop, promote, finance, or commercialize audiovisual content or related sponsorship opportunities. Defendants' acquisition, retention, and use of the Trade Secrets was through improper means and in breach of their contractual and legal duties to maintain the

confidentiality of such information and to use it only for authorized purposes.

165.    The Trade Secrets are related to products and services used in interstate commerce, including the financing, production, marketing, and distribution of audiovisual entertainment content.

166.    Defendants' conduct constitutes misappropriation of trade secrets in violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq.

167.    Defendants' misappropriation has been willful and malicious.

168.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and will continue to suffer damages including loss of competitive advantage, loss of business opportunities, harm to Plaintiff's commercialization strategy, and unjust enrichment to Defendants.

169.    Plaintiff is entitled to injunctive relief, exemplary damages, attorneys' fees where permitted, and all other remedies available under the Defend Trade Secrets Act.

## COUNT VII

### Misappropriation of Trade Secrets

### (California Uniform Trade Secrets Act, Cal. Civ. Code, §3426)

170.    Plaintiff realleges and incorporates by reference each of the preceding paragraphs.

171.    This claim is brought pursuant to the California Uniform Trade Secrets Act ("CUTSA") and is based on Defendants' misappropriation of Plaintiff's proprietary confidential business information.

172.    Plaintiff developed and owns trade secrets relating to the financing, marketing, and commercialization of the television series at issue (the "TV Series"), including but not limited to a curated list of potential sponsor advertisers, sponsor targeting strategies, verified contact information, solicitation histories, and related commercialization methodologies (the "Trade Secrets").

173.    The Trade Secrets derive independent economic value from not being generally known to the public or to other persons who could obtain economic value from their disclosure or use.

174.    Plaintiff took reasonable measures to maintain the secrecy of the Trade Secrets,

- 31 -
COMPLAINT FOR BENCH TRIAL

including restricting disclosure to Defendants pursuant to written confidentiality obligations, limiting access to such information to authorized purposes only, and maintaining the information in controlled-access environments.

175. Defendants acquired knowledge of the Trade Secrets through their contractual relationship with Plaintiff and through disclosures made solely in furtherance of the parties' collaboration.

176. After termination or breakdown of the parties' relationship, Defendants retained access to and possession of the Trade Secrets without authorization and failed to return or destroy such information despite Plaintiff's demands.

177. Defendants have used, and continue to use or threaten to use, the Trade Secrets in connection with efforts to develop, finance, promote, or commercialize audiovisual content or related sponsorship opportunities without Plaintiff's authorization. Defendants' acquisition, retention, and use of the Trade Secrets was through improper means and in breach of their contractual and legal duties to maintain the confidentiality of such information and to use it only for authorized purposes.

178. Defendants' conduct constitutes misappropriation of trade secrets within the meaning of California Civil Code § 3426.1.

179. Defendants' misappropriation has been willful and malicious.

180. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and will continue to suffer damages including loss of competitive advantage, loss of business opportunities, harm to Plaintiff's commercialization strategy, and unjust enrichment to Defendants.

181. Plaintiff is entitled to injunctive relief, damages, restitution, exemplary damages, attorneys' fees where permitted, and all other remedies available under the California Uniform Trade Secrets Act.

## COUNT VIII

### Unfair Competition

### (Cal. Bus. & Prof. Code § 17200)

182. Plaintiff realleges and incorporates by reference each of the preceding paragraphs.

COMPLAINT FOR BENCH TRIAL